ATTORNEYS FOR APPELLANT
Joel C. Wieneke
Cara Schaefer Wieneke
Wieneke Law Office, LLC
Plainfield, Indiana

ATTORNEYS FOR APPELLEE
Gregory F. Zoeller
Attorney General of Indiana

Jodi Kathryn Stein
Deputy Attorney General

Kelly A. Miklos
Deputy Attorney General
Indianapolis, Indiana

# In the
# Indiana Supreme Court


FILED
*Kevin S. Smith*
CLERK
of the supreme court,
court of appeals and
tax court

No. 20S00-1206-LW-560

TYRICE J. HALLIBURTON,

*Appellant (Defendant below),*

v.

STATE OF INDIANA,

*Appellee (Plaintiff below).*

Appeal from the Elkhart Circuit Court, No. 20C01-1101-MR-1
The Honorable Terry C. Shewmaker, Judge

On Direct Appeal Pursuant to Indiana Appellate Rule 4(A)(1)(a)

**December 19, 2013**

**Rucker, Justice.**

The State charged Tyrice J. Halliburton with murder and alleged he was a habitual offender. The State also sought life imprisonment without parole. After a trial by jury Halliburton was found guilty as charged and the jury recommended life imprisonment. Following this recommendation, the trial court sentenced Halliburton accordingly. He now appeals contending the trial court erred in admitting certain evidence and gave the jury an erroneous limiting instruction. We affirm the judgment of the trial court.

**Facts and Procedural History**

On March 18, 2008, responding to a 911 call, police discovered the lifeless body of Sheena Kiska in her apartment in Bristol, Indiana. The base of her skull was fractured, a stab wound of great force had gone through a rib and organs, and a knife wound had severed her carotid artery as well as the jugular veins on both sides of her neck. In all, Kiska had received more than fifty stab wounds. Multiple bloody knives were found in the apartment, and blood splatters, smears, and droplets were abundant in the apartment. Two days later officers returned to the apartment to conduct further investigation but were unable to gain entry because other officers had changed the lock on the door for security reasons. Halliburton, who lived in the apartment next door, observed the officers having difficulty entering Kiska's residence and retrieved a tool from his own apartment that appeared to be "a little screwdriver that kind of ha[d] a bend on the top of it." Tr. at 225. With the officers' permission, Halliburton used the screwdriver to unlock the door in a manner the officers "had never seen" before. Tr. at 225.

Halliburton was interviewed by the police three different times in the days following Kiska's death. During the first and second interviews, Halliburton stated that he left for a veterinary appointment at 1:15 the afternoon of the killing but claimed to have seen Kiska and her daughter standing outside by a white truck when he left. During the third interview, Halliburton initially began by reiterating his prior story but then offered a different account of what he had seen that day. During this interview, Halliburton claimed that he saw another resident in the hallway exiting Kiska's apartment as he was leaving for the veterinarian. He further declared that he heard noises coming from Kiska's apartment at which point he "propped the door just a little bit," Tr. at 420, and "saw [the resident] in there cutting her up." Tr. at 421.

Halliburton described the layout of Kiska's apartment and was "[v]ery detailed" about where the furniture was located and where the attack occurred. Tr. at 426. He identified the exact locations of where she had been stabbed and said that Kiska's face looked like "a piece of meat." Tr. at 429. Halliburton also said that Kiska had been attacked because "she came in at the wrong time." Tr. at 431. After the interview, the investigating officer tried to confirm Halliburton's claim with respect to where he said he had been standing when he peered through Kiska's door and purportedly witnessed the attack. However, the officer determined that it would have been physically impossible for Halliburton to have seen the attack from a crack in the door; instead he had to have been at least "two to three feet" inside the apartment. Tr. at 433. Around this same time officers recovered from Halliburton's car a DVD player that had been taken from Kiska's apartment about a month earlier.

The investigation continued, and in August 2010, Halliburton sent a letter to the police saying, "I want to clear [the resident's] name. I didn't really see him doing it." Tr. at 433-34. In January 2011, the State charged Halliburton with murder. Alleging he committed the murder by intentionally killing the victim while committing or attempting to commit burglary—pursuant to Indiana Code section 35-50-2-9(b)(1)(B)—the State filed an amended information in January 2012 seeking life imprisonment without parole. The State also charged Halliburton as a habitual offender.

Trial began April 16, 2012. During the guilt phase, testimony largely from State's witness Nicole DeFronzo revealed that in early 2008 she and her then-boyfriend Halliburton lived together in an apartment next door to Kiska. On March 18, 2008, Halliburton took his cat to a veterinary appointment where he had arranged to meet DeFronzo. Halliburton told DeFronzo that he had entered Kiska's apartment when she was not there. However, Kiska came home unexpectedly, and a struggle ensued resulting in her brutal death. More precisely, according to DeFronzo, Halliburton told her that when Kiska came home, "he didn't want to get caught so he killed her." Tr. at 523. Halliburton left Kiska's apartment and changed his bloody clothes. DeFronzo helped dispose of the clothes and they drove to the home of DeFronzo's mother, a registered nurse, who bandaged a wound on Halliburton's hand. For over three years

3

DeFronzo did not reveal to anyone what Halliburton had told her about Kiska's death. Nor had she revealed her own complicity in helping get rid of evidence.

During trial the State introduced numerous exhibits including photographs of the crime scene, pre and post autopsy photographs, and a rib bone of the victim that had been removed during autopsy. The State also introduced evidence that Halliburton had committed a burglary of Kiska's apartment approximately a month prior to the killing; and for which the trial court gave a limiting instruction. Further the State called DeFronzo's mother as a witness who testified, among other things, that she had counseled her daughter to come forward with what she knew and "to tell the truth." Tr. at 484.

The jury found Halliburton guilty of murder as charged. At the penalty phase of trial, the jury recommended life imprisonment without parole. And thereafter Halliburton admitted to being a habitual offender. Following a sentencing hearing the trial court sentenced Halliburton consistent with the jury's recommendation.[1] Halliburton seeks review raising four claims of error which we rephrase as the following two: (1) did the trial court err in admitting certain evidence, and (2) was the trial court's limiting instruction erroneous. Pursuant to Indiana Appellate Rule 4(A)(1)(a) this Court has mandatory and exclusive jurisdiction over this appeal. Additional relevant facts are set forth below.

---

[1] The record is silent on the disposition of Halliburton's habitual offender adjudication. The trial court noted: "If I were called upon to impose a term of [years] it would be 65 for the murder and 30 for the habitual, consecutive to each other for a total sentence of 95 years; but that's not the situation here. . . ." Tr. at 800. It is unclear whether the trial court took the position that it would be redundant and unnecessary to enhance Halliburton's life without parole sentence or whether the trial court was under the impression that it was prohibited from doing so. On this latter point we observe there is no statutory bar to enhancing a sentence of life without parole with a term of years for a habitual offender adjudication. The express language of the habitual offender statute provides in pertinent part: "The court *shall* sentence a person found to be a habitual offender to an additional fixed term . . . ." I.C. § 35-50-2-8(h) (emphasis added). And in a slightly different context trial courts routinely impose sentences of life without parole along with a consecutive term of years. See, e.g., Turner v. State, 953 N.E.2d 1039, 1045 (Ind. 2011) (defendant sentenced to life without parole plus eighty-eight years upon convictions for murder, robbery, burglary, and seven counts of criminal confinement); Treadway v. State, 924 N.E.2d 621, 626-27 (Ind. 2010) (defendant sentenced to life without parole plus twenty years upon convictions for murder and robbery); see also Ward v. State, 903 N.E.2d 946, 950 n.4 (Ind. 2009) (defendant sentenced to death plus fifty years upon convictions for murder and rape). In any event the State did not object to the trial court's sentencing order and makes no claim in this regard on appeal. Thus error, if any, is waived.

## Discussion

## I. Admission of Evidence

Halliburton alleges the trial court erred in admitting the following: various pre and post autopsy photographs, purported bad acts evidence of Halliburton's prior involvement in a burglary at the victim's home, and alleged vouching testimony from one of the State's witnesses. "A trial court has broad discretion in ruling on the admissibility of evidence and we will disturb its rulings only where it is shown that the court abused that discretion." Turner, 953 N.E.2d at 1045. "An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before it." Id.

### A. Admission of Photographs

The trial court admitted into evidence exhibits which Halliburton characterizes as "27 gruesome photographs depicting all or part of Kiska's body after her murder." Br. of Appellant at 8-9 (emphasis in original). However, Halliburton objected only to five of these photographs: State's Exhibits 11, 12, 68, 76, and 77. Thus we examine whether the trial court abused its discretion in admitting these five exhibits over Halliburton's objection. As for the remaining photographs, Halliburton has the burden of demonstrating that their admission amounted to fundamental error.

State's Exhibits 11 and 12 show two different angles of Kiska's body as seen by the investigating officer when he arrived on the crime scene. In both photographs the face of the body is covered in blood and there are apparent knife wounds to the neck. Halliburton objected to their admission into evidence on grounds they "[would inflame] the passions of the jury, and that [they] would be highly prejudicial to be admitted." Tr. at 79, 82.

"[G]enerally, photographs depicting the crime scene and victim's body are admissible as long as they are relevant and competent aids to the jury." Woods v. State, 677 N.E.2d 499, 504 (Ind. 1997). In this appeal Halliburton does not contend the photographs were irrelevant. Instead he makes the more general claim that the exhibits are "gruesome" and serve to "inflame[]

5

the emotions of the jury." Br. of Appellant at 6-7. We would agree that these two photographs depicting the victim's blood-stained face are at least graphic if not gruesome. But "[e]ven gory and revolting photographs may be admissible as long as they are relevant to some material issue *or* show scenes that a witness could describe orally."[2] Amburgey v. State, 696 N.E.2d 44, 45 (Ind. 1998) (emphasis added). Further, "[a]lthough a photograph may arouse the passions of the jurors, it is admissible unless 'its probative value is substantially outweighed by the danger of unfair prejudice.'" Cutter v. State, 725 N.E.2d 401, 406 (Ind. 2000) (internal citations omitted).

In this case the record shows that Michael Swallow—Chief of Police of the Bristol Police Department—was the first officer to arrive on the crime scene and one of the officers who first entered Kiska's apartment. Chief Swallow testified to the state of the apartment as he found it and the condition and location of Kiska's bloodied body on the living room floor. He observed "a large amount of what appeared to be blood in the vicinity of the body"—"between the body and the door, and then right with the body as well." Tr. at 61, 62. Two bloody knives were visible at the scene—one lying in the hallway area and another in close proximity to Kiska's body. He also described the extent of the wounds that he observed on Kiska's neck and face. Chief Swallow testified that the State's Exhibits 11 and 12 accurately represented his observations on the day Kiska was killed. Because the photographs depicted the very scene that the witness described in his testimony, because Halliburton does not contend the photographs were irrelevant or immaterial, and because he has not demonstrated their probative value was substantially outweighed by the danger of unfair prejudice, we conclude the trial court did not abuse its discretion by admitting the exhibits into evidence.

Exhibits 68, 76, and 77 are autopsy photographs showing the victim's neck and the skin pulled away from the victim's skull. Halliburton objected to the admission of these exhibits into evidence on the same ground that he objected to Exhibits 11 and 12, namely, they "[would

---

[2] Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ind. Evidence Rule 401. Evidence is material "if there is a reasonable likelihood that it might have affected the outcome of the trial." Samaniego v. State, 679 N.E.2d 944, 948 (Ind. Ct. App. 1997), trans. denied.

inflame] the passions of the jury, and that [they] would be highly prejudicial to be admitted."[3] Tr. at 79, 82. In this appeal Halliburton acknowledges this Court has held that autopsy photographs of a victim "are relevant not only to prove his or her identity, but serve as an aid to understanding the pathologist's findings on the cause of death." Br. of Appellant at 10 (quoting Woods, 677 N.E.2d at 504). But he then appears to contend that because there was no dispute concerning Kiska's identity and cause of death the exhibits were inadmissible.[4] Id. This argument fails. A claim similar to the one Halliburton makes here was made and rejected in Butler v. State, 647 N.E.2d 631 (Ind. 1995). In that case the defendant argued the trial court erroneously admitted into evidence autopsy photographs and a videotape of the crime scene because the cause of death was not at issue and thus "the only other possible purpose in introducing the photographs was to inflame the emotions of the jurors." Id. at 633. In rejecting this argument the Court observed: "[T]here is no rule limiting the facts in issue when one party unilaterally concedes or offers to stipulate that a fact be taken as proved." Id. at 634. Instead, we concluded: "In a homicide case, the identity of the alleged victim and the assailant, the injury to the alleged victim and its source, the death of the alleged victim and its cause, and the physical surroundings in which the injury and death occurred, would all be facts of consequence in the determination of guilt of the accused." Id. We reach the same conclusion here.

Further we have acknowledged that autopsy photographs often present unique problems because the pathologist has manipulated the body in some way during the autopsy. Corbett v. State, 764 N.E.2d 622, 627 (Ind. 2002). And autopsy photographs are generally inadmissible if they show the body in an altered condition. Id. However, "there are situations where some alteration of the body is allowed where necessary to demonstrate the testimony being given."

---

[3] Halliburton's objection to Exhibits 68, 76, and 77 was actually made to the bench outside the hearing of the jury. However, the trial court declared: "The record reflects essentially the same objection that he's making now that was made specifically on Exhibits 11 and 12." Tr. at 277. To which counsel responded: "Correct, sir." Tr. at 277. The trial court continued, "[a]nd you're reiterating the same objection" and counsel replied, "[y]es, sir." Tr. at 277.

[4] We say "appears to contend" because Halliburton does not specifically focus on Exhibits 68, 76, and 77. Instead Halliburton includes these exhibits with his argument concerning the twenty-two other exhibits admitted into evidence and to which he expressly declared, "no objection" or "I have no objection." See Tr. at 78, 79 (Exhibit 10); Tr. at 129 (Exhibit 15); Tr. at 138 (Exhibit 26); Tr. at 159 (Exhibit 32); Tr. at 170 (Exhibit 37); Tr. at 276 (Exhibits 64, 65, 69, 70, 72 and 75); Tr. at 293 (Exhibits 80 through 84); Tr. at 302 (Exhibits 88 through 91, and 94 through 96).

Swingley v. State, 739 N.E.2d 132, 134 (Ind. 2000). For example in Fentress v. State, 702 N.E.2d 721, 722 (Ind. 1998), we held admissible two photographs that depicted the victim's skull with the hair and skin pulled away from it. Because the pathologist had explained what he had done and the alteration was necessary to determine the extent of the victim's injuries, we found that the "potential for confusion [was] minimal" and that the probative value outweighed the prejudicial effect. Id. at 722. The same is true in the case before us.

The record shows that forensic pathologist, Dr. Joseph Prahlow, conducted the autopsy on Kiska's body. He concluded that the cause of her death was "multiple sharp force injuries." Tr. at 309. During the course of his testimony Dr. Prahlow stated that the blunt force injuries to Kiska's head would be difficult to determine without an internal examination, partially because of the victim's hair. To that end, he explained that during the internal examination, he peeled Kiska's scalp away from the skull to allow him to see "bruises of the scalp area, most of which are distinct from and not associated with any sharp force injuries." Tr. at 271. He pointed out these bruises in Exhibit no. 68. Dr. Prahlow explained that during the internal examination the skull and brain are removed after the scalp has been peeled back, which allows him to see the base of the skull. It was at this point that he was able to discover the fracture to the skull caused by a stab wound to Kiska's right cheek. This fracture is illuminated in Exhibit no. 76. Finally, Dr. Prahlow testified that Exhibit no. 77 is a close-up version of the fracture to Kiska's skull and this photograph shows a probe inserted into the skull in order to point directly to the location of the fracture. We conclude the trial court did not abuse its discretion by admitting into evidence State's Exhibits 68, 76, and 77.

With respect to the remaining twenty-two photographs about which he now complains, Halliburton concedes that he did not object to these exhibits at trial. Halliburton thus asserts that their admission "constituted fundamental error." Br. of Appellant at 9.

"Failure to object at trial waives the issue for review unless fundamental error occurred." Treadway v. State, 924 N.E.2d 621, 633 (Ind. 2010). The fundamental error doctrine is an exception to the general rule that the failure to object at trial constitutes procedural default

8

precluding consideration of the issue on appeal.  See Benson v. State, 762 N.E.2d 748, 755 (Ind. 2002).  We have elaborated on the underlying rationale for this exception:

> There are very strong reasons to require objections at trial to preserve error. Important among them is that the trial court can often correct an error if it is called to the court's attention. This can result in enormous savings in time, effort and expense to the parties and the court, including avoiding an appeal and retrial. Moreover, if matters can be heard on appeal despite failure to object at trial, parties detecting such an error may be encouraged to take their chances on the result in the trial court despite the error, secure in the knowledge that a retrial is available. Despite these considerations, the doctrine of fundamental error has been invoked to ensure failure to object where appellate courts have found an error to be sufficiently egregious.

State v. Daniels, 680 N.E.2d 829, 835 (Ind. 1997).  Hence, "[t]he 'fundamental error' exception is extremely narrow, and applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process."  Mathews v. State, 849 N.E.2d 578, 587 (Ind. 2006).  "The error claimed must either make a fair trial impossible or constitute clearly blatant violations of basic and elementary principles of due process."  Brown v. State, 929 N.E.2d 204, 207 (Ind. 2010) (internal quotation omitted).  "This exception is available only in egregious circumstances."  Id. (internal quotation omitted).

Concerning the twenty-two photographs at issue, we make the following observations. First, at trial Halliburton did not simply "fail" to object to the exhibits.  Instead, on eight separate occasions over the course of a five-day trial during which the State offered the exhibits for admission into evidence, and after inquiry by the trial court, Halliburton expressly said "no objection" or "I have no objection."  See n.4.  "The appellant cannot on the one hand state at trial that he has no objection to the admission of evidence and thereafter in this Court claim such admission to be erroneous."  Harrison v. State, 281 N.E.2d 98, 100 (Ind. 1972).  Further, the doctrine of fundamental error is inapplicable to the circumstances presented here.  The doctrine presupposes the trial judge erred in performing some duty that the law had charged the judge with performing *sua sponte*.  Presumably a trial judge is aware of her own *sua sponte* duties.  But upon an express declaration of "no objection" a trial judge has no duty to determine which

9

exhibits a party decides, for whatever strategic reasons, to allow into evidence. "[O]nly the interested party himself can really know whether the introduction or exclusion of a particular piece of evidence is in his own best interests." Winston v. State, 332 N.E.2d 229, 233 (Ind. Ct. App. 1975).

Second, other than repeating the refrain that the exhibits were "gruesome," see Appellant's Br. at 3, 6, 8, 9, 10, 11, Halliburton offers no explanation as to how their alleged erroneous admission made a fair trial impossible or constituted clearly blatant violations of basic and elementary principles of due process. See Brown, 929 N.E.2d at 207. Finally, all of the exhibits about which Halliburton complains were either photographs of the crime scene from various angles which aided the testimony of the on-the-scene investigating officers, or autopsy photographs, which the pathologist relied upon during his trial testimony. We conclude the trial court committed no error, let alone fundamental error, by admitting these photographs into evidence.[5]

B. *Purported Vouching Testimony*

Next Halliburton complains of error in the introduction of testimony from state's witness Cynthia Bollenbaugh—DeFronzo's mother. Acknowledging he did not object to Bollenbaugh's testimony, Halliburton again invokes the doctrine of fundamental error. And again we repeat the fundamental error doctrine is an exception to the general rule that the failure to object at trial constitutes procedural default precluding consideration of the issue on appeal. Benson, 762 N.E.2d at 755. "[This] exception is extremely narrow, and applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial,

---

[5] Halliburton also asserts fundamental error with respect to the admission into evidence of State's Exhibit 54—a container holding "two pieces of bone" identified as the victim's "fourth rib." Tr. at 214. As with the now challenged twenty-two photographs, Halliburton also said, "[n]o objection, your honor" when the exhibit was introduced. Tr. at 217. However there is no indication in the record before us demonstrating this exhibit was ever shown to the jury. The State specifically moved to "defer publication at this time on [Exhibit 54]." And the trial court ruled: "Publication of Exhibit 54 . . . will occur, if requested, without objection." Tr. at 217. Our review of the record does not reveal that the State ever requested publication, and there is no other reference to Exhibit 54 in the trial transcript. Indeed, neither the physical exhibit itself nor a photograph of the exhibit appears in the record before us. Thus error, if any there be, is harmless.

and the resulting error denies the defendant fundamental due process." Mathews, 849 N.E.2d at 587. The error claimed "must either make a fair trial impossible or constitute clearly blatant violations of basic and elementary principles of due process." Brown, 929 N.E.2d at 207 (internal quotation omitted). This exception is available only in egregious circumstances. Id.

Indiana Evidence Rule 704(b) provides: "Witnesses may not testify to opinions concerning intent, guilt, or innocence in a criminal case; the truth or falsity of allegations; whether a witness *has testified* truthfully; or legal conclusions." (emphasis added). And this Court has held, "[n]o witness, whether lay or expert, is competent to testify that another witness is or is not telling the truth." Hoglund, 962 N.E.2d 1230, 1238 (Ind. 2012) (alteration in original) (quoting Barger v. State, 587 N.E.2d 1304, 1308 (Ind. 1992) (quotation omitted)); Shepherd v. State, 538 N.E.2d 242, 243 (Ind. 1989). But our holding in this regard relates to the proffered testimony at trial. According to Halliburton "testimony from DeFronzo's mother . . . served no other purpose than to impermissibly vouch for DeFronzo's credibility, thereby giving DeFronzo's testimony a prejudicial impact that obliterated Halliburton's opportunity to receive a fair trial." Br. of Appellant at 22. The essential facts are these.

Bollenbaugh testified that sometime around 3:30 p.m. on March 18, 2008 Halliburton and her daughter DeFronzo came over to her house after returning from an appointment with a veterinarian. Asserting that Halliburton "had suffered a cat scratch" DeFronzo asked her mother—a registered nurse—to look at the injury. Tr. at 474. Bollenbaugh did so, noted that "it looked like to me a puncture wound," Tr. at 476, cleaned the wound and dressed it. The couple left the house after about an hour. A few minutes later DeFronzo called her mother and told her they "weren't allowed to enter the apartment building. That there was something going on." Tr. at 478. Bollenbaugh later learned that someone had been killed in the apartment next door to her daughter's apartment. The State next inquired: "Did there come a point in time thereafter where you had conversations with your daughter regarding the murder?" Tr. at 480. Bollenbaugh said, "[y]es" and the following exchange occurred:

> [Q]: And did [DeFronzo] indicate to you and tell you what she
> knew about the murder of Sheena Kiska?

11

[A]:  Yes.

[Q]:  This was on December 25, Christmas day.
[A]:  Christmas day.

[Q]:  2011.

[A]:  Yes.

[Q]:  And was that the first time that your daughter had told you things that she knew about the murder of Sheena Kiska?

[A]:  Yes.

[Q]:  And once you were aware of these things, what did you do?

[A]:  I begged her to tell the truth.

[Q]:  Tell the truth to who?

[A]:  To the law enforcement, to -- I said you cannot go up and testify and lie.  You cannot do it.  I said you have to tell the truth. It's the right thing to do.

*       *       *

[Q]:  So once she told you what she knew about the murder, she was not interested in stepping forward and telling the truth at first.

[A]:  At first, yes.

[Q]:  Did there come a point in time when you were able to convince her otherwise?

[A]:  Yes.

Tr. at 483-84.[6]


"Indiana Evidence Rule 704(b) prohibits a witness from testifying about whether a witness *has testified* truthfully." Whedon v. State, 900 N.E.2d 498, 506 (Ind. Ct. App. 2009) (emphasis added) (citation omitted), aff'd 905 N.E.2d 408 (Ind. 2009).  The record makes clear

---

[6] Although Halliburton cites nearly three pages of testimony in his appellate brief, the thrust of his argument is based primarily on the aforementioned colloquy.

that during Bollenbaugh's testimony, she stated only what she told DeFronzo. Nowhere in the record does Bollenbaugh claim DeFronzo's testimony was truthful or even that the testimony DeFronzo offered at trial was even consistent with what Bollenbaugh had previously been told. In fact, with the agreement of the parties, the trial court permitted the State to lead the witness during that portion of the examination undoubtedly to ensure that Bollenbaugh did not proffer hearsay statements from her conversation with DeFronzo or any otherwise inadmissible testimony. Even accepting that Bollenbaugh convinced her daughter "to tell the truth" "[t]o the law enforcement," Tr. at 484, the testimony elicited at trial never revealed comments declaring what Bollenbaugh believed "the truth" to be. And most importantly Bollenbaugh never claimed that DeFronzo's testimony at trial was truthful. Contrary to Halliburton's insistence that we simply draw such an inference, our jurisprudence requires more. See, e.g., Bufkin v. State, 700 N.E.2d 1147, 1150 (Ind. 1998) (finding error when witness bolstered another witness' testimony by declaring that he found the witness to be "credible"); Head v. State, 519 N.E.2d 151, 153 (Ind. 1988) (concluding "it was entirely improper for [the State's] witness to review each item of the child's testimony and to specifically vouch for the truthfulness of such testimony"). See also Wilson v. United States, 149 F. Supp. 2d 1045, 1050 (N.D. Ind. 2001) (concluding that "[witness'] testimony did not constitute improper vouching or bolstering because he did not express a personal opinion as to [another witness'] credibility nor imply that evidence not before the jury supported a finding that [defendant] was guilty"). On this issue we find no error, fundamental or otherwise.

### C. Evidence of Other Crimes

For his last claim concerning the admission of evidence Halliburton asserts the trial court erred in admitting evidence that he committed a burglary of Kiska's apartment a few weeks before she was killed contrary to Indiana Evidence Rule 404(b). The Rule provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case

13

shall provide reasonable notice in advance of trial, or during trial if the court excuses pre-trial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Rule 404(b) "is designed to prevent the jury from making the 'forbidden inference' that prior wrongful conduct suggests present guilt." Byers v. State, 709 N.E.2d 1024, 1026-27 (Ind. 1999); see also Bassett v. State, 795 N.E.2d 1050, 1053 (Ind. 2003) (noting the purpose behind Rule 404(b) is to "prevent[] the State from punishing people for their character, and evidence of extrinsic offenses poses the danger that the jury will convict the defendant because . . . he has a tendency to commit other crimes") (internal quotation omitted). "In assessing the admissibility of 404(b) evidence [the] trial court must: (1) determine that the evidence of other crimes, wrongs, or acts is relevant to a matter at issue other than the defendant's propensity to commit the charged act and (2) balance the probative value of the evidence against its prejudicial effect pursuant to Rule 403." Wilson v. State, 765 N.E.2d 1265, 1270 (Ind. 2002) (quotation omitted).

The facts supporting Halliburton's claim are as follows. Prior to trial the State filed in open court and served upon Halliburton its "Formal Notice Of State's Intent To Use 404(b) Evidence," which included evidence that Halliburton committed a burglary of Kiska's residence on or about February 4, 2008. App. at 48.

When the State first proceeded to introduce such evidence through the testimony of investigating officer, Chief Deputy Mike Albin, counsel for Halliburton objected, and outside the presence of the jury declared:

> I think that if information about a prior burglary comes in, combined with some of the testimony that we have heard or may hear in the future, that it will be *highly prejudicial* to Mr. Halliburton, and the jury will make an unfortunate and inappropriate or improper leap to conclude that Mr. Halliburton, in fact, committed the burglary in February; and therefore, was going to commit another burglary on March 18, 2008. I think it's *highly prejudicial*.

Tr. at 240 (emphasis added). After entertaining arguments of counsel, the trial court ruled: "For now at this point in the trial, the objection is sustained for this evidence to come through this witness at this time." Tr. at 246.

14

Later during trial the State called DeFronzo as a witness. During the course of her testimony the State asked whether she was "aware of whether or not Tyrice Halliburton had been in . . . Sheena's apartment before." Tr. at 545. Counsel objected, the jury was excused, and extensive arguments ensued, which included *voir dire* of DeFronzo. See Tr. at 546-54. At the conclusion of which the trial court summarized events as follows: "Mr. [Halliburton's Counsel] first objected to Chief Deputy Albin's testimony on the grounds that it was *prejudicial* and the *prejudice would outweigh the probative value* as set forth in 404(b). Is that correct?" To which counsel replied: "That's correct, sir." Tr. at 554-55 (emphasis added). The trial court continued: "And you're making that same objection, now, Mr. [Halliburton's counsel], relative to Ms. DeFronzo's testimony that we just heard out of the jury's presence?" Tr. at 555. To which counsel replied: "That's correct." Tr. at 555. When counsel then proceeded to further elaborate, the trial court interjected: "Well, that's what I said. You're saying it has *some probative value*, but the *prejudice outweighs the probative value*." Tr. at 555 (emphasis added). To which counsel responded: "Yes. Yes. That's my argument." Tr. at 555. The trial court then gave a lengthy recitation of why it thought the evidence was relevant, and why it would be admissible for the limited purpose of proving motive, intent, preparation, plan, absence of mistake or fact. See Tr. at 556-58. The trial court ultimately concluded: "I think the probative value outweighs the prejudice . . . ." Tr. at 558.

Although counsel for Halliburton objected to the admission of the evidence, the trial court declared: "If the defendant wants a limiting instruction, I will give it. That's a yes. You shook your head." Tr. at 558. To which counsel replied: "That would be a yes, sir." Tr. at 558. After the jury returned the trial court gave a limiting instruction that we will discuss below in Part II. DeFronzo continued her testimony and recounted that in February 2008, Halliburton entered Kiska's home without her permission or consent, told DeFronzo about the incident, and showed her the items he had taken including a laptop computer, a camcorder, a lock box with cash in it, and a DVD player. Halliburton did not tell DeFronzo how he gained entry.

In this appeal, Halliburton argues the trial court erred in admitting evidence of the burglary because "the prior burglary did not fit within one of the rule 404(b) exceptions as it related to the only charge Halliburton was facing in this case: intentional murder." Br. of

Appellant at 14. According to Halliburton "[b]ecause evidence of the prior burglary constituted bad character evidence and was not admissible under any of the exceptions listed in Rule 404(b), the trial court improperly admitted it into evidence." Br. of Appellant at 17.

The law in Indiana is well settled that "a defendant may not argue one ground for objection at trial and then raise new grounds on appeal." Turner, 953 N.E.2d at 1058 (quoting Gill v. State, 730 N.E.2d 709, 711 (Ind. 2000)). As above recited, at trial Halliburton objected to testimony concerning the prior burglary on grounds that its probative value was outweighed by its prejudicial impact. Essentially Halliburton's objection was based not on Rule 404 but Rule 403 which declares in pertinent part: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." Halliburton made no claim at trial that evidence of the burglary did not fit any of the 404(b) exceptions; nor did he contend at trial that evidence of the burglary was bad character evidence prohibited by Rule 404(b). Accordingly Halliburton has waived this claim of error for appellate review.[7] See Gill, 730 N.E.2d at 711.

## II. Limiting Instructions

As indicated above, before DeFronzo resumed her testimony, at Halliburton's request the trial court gave the jury a limiting instruction. Halliburton now contends the instruction was "improper." Br. of Appellant at 20. However, Halliburton did not object to the instruction. And "[n]othing is preserved on appeal where a defendant fails to object to a limiting instruction." Stahl v. State, 616 N.E.2d 9, 13 (Ind. 1993). Thus, as with most of Halliburton's claims we view this issue also through the lens of fundamental error.

---

[7] Assuming for the sake of argument that evidence of the burglary was inadmissible character evidence, and as Halliburton contends, does not fit within any of the Rule 404(b) exceptions, he still has failed to show how introduction of the evidence amounted to fundamental error. The evidence supporting the jury's guilty of murder verdict was overwhelming. Indeed Halliburton makes no claim challenging the sufficiency of the evidence. Where evidence of guilt is overwhelming any error in the admission of evidence is not fundamental. See Sobolewski v. State, 889 N.E.2d 849, 858 (Ind. Ct. App. 2008) (finding "harmless" and not "fundamental" any error in the State's use of Defendant's silence "given the overwhelming evidence offered to impeach [the Defendant] as well as the evidence of his guilt."), trans. denied.

The instruction at issue declared:

> You're about to hear evidence that is being offered for a limited purpose. The evidence that you are about to hear is not being offered to prove the character of any person. It is offered for the limited purpose of establishing proof of motive, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. It's admissible for that limited purpose because *I have ruled that is relevant, and the probative value outweighs any prejudice there may be.* The evidence, as I said, is being admitted for this limited purpose and for no other purpose.

Tr. at 559 (emphasis added).[8] Essentially focusing on the highlighted language of the instruction, Halliburton contends the trial court improperly vouched for the credibility of the evidence as well as commented on the weight the jury should give the evidence.

It is mandatory for a trial court, upon request, to give a limiting instruction or an admonishment where evidence is introduced for limited purposes. See Evid. R. 105 ("When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and admonish the jury accordingly."). However, we have long held that "an instruction directed to the testimony of one witness erroneously invades the province of the jury when the instruction intimates an opinion on the credibility of a witness or the weight to be given to his testimony." Pope v. State, 737 N.E.2d 374, 378 (Ind. 2000) (quoting Fox v. State, 497 N.E.2d 221, 225 (Ind. 1986); see also Taylor v. State, 278 N.E.2d 273, 275 (Ind. 1972) ("An instruction in a criminal case is erroneous, as an invasion of the province of the jury, if it intimates an opinion of the credibility of a witness or the weight to be given to his testimony.").

Here the instruction did not imply that the trial court had formed an opinion on the credibility of a witness or the weight the jury was to give the witness' testimony. However, the instruction nonetheless advised the jury that the trial court had made a preliminary determination

---

[8] Later during trial the State recalled to the stand Chief Deputy Albin who testified, among other things, about a DVD player that was taken in the February burglary and later recovered from Halliburton's car. Prior to his testimony on this point the trial court gave the jury a similar limiting instruction. See Tr. at 616-17. Again, Halliburton did not object.

that the testimony the jury was about to hear is "relevant" and that the trial court had made a preliminary determination that the probative value of such testimony "outweighs any prejudice there may be." Tr. at 559. Although appropriate as an evidentiary ruling, the highlighted portion of the limiting instruction should not have been read to the jury in that it had no role in the matter. "The court and not the jury determines the admissibility of evidence, and the foundation for the admission of secondary evidence is a matter alone for the court and not for the jury." Sprague v. State, 181 N.E. 507, 512 (Ind. 1932); Pritchard v. State, 230 N.E.2d 416, 417 (1967) ("This being a criminal case, the determination of the admissibility of the evidence is a function alone of the trial court . . . ." (citations omitted)).[9]

In the end we conclude the limiting instruction was given in error. However, Halliburton makes no claim the error was fundamental. And we find no such error to have occurred.

## Conclusion

We affirm the judgment of the trial court.

Dickson, C.J., and David, Massa and Rush, JJ., concur.

---

[9] The Indiana Pattern Jury Instruction resolves this concern:

> Evidence has been introduced that the Defendant was involved in (crimes) (a crime) (wrongful conduct) (bad acts) other than (those) (that) charged in the information. This evidence has been received solely on the issue of Defendant's (identity) (motive) (intent) (preparation) (plan) (knowledge) (absence of mistake) (absence of accident) (sanity). This evidence should be considered by you only for that limited purpose.

Indiana Pattern Jury Instructions – Criminal 12.17 (2013).

The Indiana Pattern Jury Instructions are prepared under the auspices of the Indiana Judges Association and the Indiana Judicial Conference Criminal and Civil Instruction Committees. Although not formally approved for use, they are tacitly recognized by Indiana Trial Rule 51(E).